# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

    Plaintiff,

vs.                                                             Case No. 1:20-CR-00897 KWR

STEVEN ANDERSON,

    Defendant.

## **MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on Defendant's motion to suppress evidence **(Doc. 33)**. The Court held an evidentiary hearing on April 14, 2021. Having reviewed the pleadings and evidence and heard testimony at the hearing, the Court finds that Defendant's motion to suppress is not well-taken and, therefore, is **DENIED**.

## BACKGROUND

Defendant is charged with felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924. The Court finds the following facts based on the testimony and evidence admitted at the suppression hearing, including two lapel camera videos admitted into evidence but not played at the hearing. The Court also took judicial notice of the transcript of Sgt. Danius' testimony at the preliminary hearing before Judge Khalsa, without objection.

**I.     Sgt. Danius was on patrol and was waved down by a woman requesting help.**

Sgt. Ignas Danius was patrolling the southeast quadrant of Albuquerque, New Mexico in a marked car. He observed a woman and Defendant standing on a sidewalk. As he drove by, the woman waved her hand at him and pointed to Defendant. Sgt. Danius credibly testified that he

saw her face and she appeared to be frightened. Sgt. Danius credibly believed that she was flagging him down and she needed his assistance. As he drove past, Sgt. Danius said he continued to observe them through the rearview mirror. He believed that she was watching him to see if he would come and help her, and he observed Defendant turn around and start walking away. Sgt. Danius did a U-turn to talk to the woman. Defendant was not present by the time Sgt. Danius stopped. Sgt. Danius credibly testified that he would not have stopped had he just seen the woman and Defendant talking on the sidewalk.

Sgt. Danius rolled down his window and asked her "Are you okay? Is everything okay?" She responded "That man right there, he was harassing me. He was asking me to date him. He was asking me for money. And he wouldn't leave me alone." Sgt. Danius testified that she appeared to be frightened, concerned, and "shaken up." He also testified that she said "[h]e's harassing me. He's not leaving me alone. He's asking me for my number. He's asking to date him. If I have a boyfriend, and then he asked me for money."

Sgt. Danius did not ask her name. He did not take any written statement from her or activate his lapel camera. He stated that he didn't know why he failed to do so. He said "[i]t just happened so fast, I think my focus and my concern was if she was okay. I didn't know where this contact was going to lead to or anything like that. I was still seated in my vehicle. Like I said, it was very, very brief. I rolled down my window and checked on her. She told me very quickly that information. And I said okay, let me check it out. Let me see what's going on. And I drove off."

Sgt. Danius testified that he didn't' want to lose the Defendant, who had walked away. Sgt. Danius briefly lost sight of Defendant. Sgt. Danius drove in the direction he saw Defendant walk.

Sgt. Danius caught up to Defendant. He observed Defendant walking in the street. Before contacting Defendant, Sgt. Danius requested backup assistance because he did not want to contact Defendant by himself. He said he did so because this was a potential harassment incident, and for his safety or in case the Defendant fled, he wanted other officers around. He asserted this was normal procedure.

**II.  Encounter with Defendant.**

Sgt. Danius' encounter with Defendant was recorded on a lapel camera. **Ex. 1, Ex. A.** The Court finds Sgt. Danius' testimony about the encounter credible and consistent with the lapel video. When an assisting officer arrived, Sgt. Danius exited his patrol vehicle and called out to Defendant. Defendant put his hands up as soon as Sgt. Danius approached. Sgt. Danius did not ask him to do so and his firearm was holstered.

Sgt. Danius called out to him – "hey what's up man". Sgt. Danius asked him why he was walking in the street and told Defendant that a woman said he was bugging her. Defendant said he didn't know what was going on and indicated that he didn't understand why Sgt. Danius stopped him. Sgt. Danius repeated his reasons for stopping Defendant.

Sgt. Danius testified that Defendant was nervous. Defendant immediately put his hands up when Sgt. Danius said "hey what's up man." Sgt. Danius did not have a weapon in his hand and was not yelling. Sgt. Danius initially did not instruct Defendant to keep his hands where he could see them.

Sgt. Danius testified that Defendant said he only asked her if she had a man, and that he wanted to go back and apologize to her if she felt disrespected. From the lapel camera video, it is unclear whether Defendant said "bed" or "man" to Sgt. Danius. Sgt. Danius testified he understood

3

that Defendant was trying to find out if she was in a relationship. Sgt. Danius believed that Defendant's story gave credibility to the woman's account.

Sgt. Danius asked Defendant if he had identification on him, and Defendant said no. Sgt. Danius also asked if Defendant had any weapons. Defendant initially did not respond but said no when asked a second time.

### III. Pat Down search and arrest.

Sgt. Danius told Defendant to put his hands on top of his head and informed Defendant he was going to conduct a pat down search at approximately 2:20 into his lapel video. **Ex. 1.** This interaction through the pat down was completed by 4 minutes and 40 seconds into the lapel camera video. **Ex. 1.**

Sgt. Danius testified that he conducted the pat down in part because of Defendant's nervous behavior, his hands going up, and his multiple layers of clothing. A woman asserted that Defendant had harassed her and wouldn't leave her alone, and he had fled the scene. He could not see Defendant's waistband through his clothing. Sgt. Danius asserted that when he told Defendant he was following up on a complaint from the woman he was talking to, Defendant kept repeating that he did not understand what was going on and that he didn't understand why he was stopped. The Court finds that Sgt. Danius was clear in explaining why he was stopped, and that a reasonable officer could view Defendant as being nervous.

Sgt. Danius also asked Defendant if he had any weapons. Defendant ignored the question the first time, and the second time he quickly said no. Sgt. Danius said Defendant's behavior made him nervous and he was concerned Defendant was armed.

Sgt. Danius noted that Defendant resisted during the pat down. Defendant did not follow Sgt. Danius' request to put his hands on top of his head, and instead tensed his arms near his sides.

Sgt. Danius believed that Defendant was trying to prevent him from doing a pat down. The officers placed Defendant in handcuffs and had him sit on the curb.

As recounted by Sgt. Danius, Defendant repeatedly gave Sgt. Danius false identification, including false names and a social security number that belonged to another person. Sgt. Danius checked Defendant's proffered identification on his computer and each time it was false. Defendant never gave his real name or identification. Sgt. Danius testified that he arrested Defendant in part for concealing his identity. During a full search, Sgt. Danius found a loaded revolver in his waistband.

### IV. Community Engagement and Proactive Patrol

On the day of the incident, Sgt. Danius was on a 45-day assignment in the street crime unit. At the preliminary hearing, Sgt. Danius testified that this was "a proactive unit that goes out there and basically zero tolerance, looks for any violation, for any violations to reduce crime in the areas where the crime is very high." **Doc. 19 at 11.** He was patrolling the southeast quadrant of Albuquerque that day, but the street crime unit operated in all quadrants of Albuquerque. Defendant testified there was no specific training for proactive patrol and affirmed that there were no special limits placed on his discretion.

Defendant focused in large part Sgt. Danius' testimony about "proactive patrol." Sgt. Danius testified that rather than merely responding to calls, on proactive patrol officers were expected to patrol the area and "pay attention to what's going on." Sgt. Danius stated that he was not assigned to take calls that day, meaning instead he would spend his time addressing crimes he observed. There was no special written procedure for proactive patrol. The Court finds that "proactive patrol" simply means patrolling an area to observe and respond to suspected criminal activity.

Sgt. Danius testified that he was trained on community policing through an annual training. He remembers seeing a PowerPoint presentation, and a pamphlet printed from an online source by his Sergeant.

Defendant presented an affidavit with statistics regarding the racial breakdown of te community in the La Mesa neighborhood, where the incident occurred, and Bernalillo county generally. The affidavit asserted that La Mesa was a "minority community" comprised of a population that was 73.5% Hispanic, 15.0% white, and 1.6% African-American. **Ex. B.** The African-American population in La Mesa appears to be a smaller percentage of the population than in Bernalillo county as a whole. *See* **Doc. B at 2.** In other words, to the extent Defendant argues that the street crimes unit was targeting the La Mesa community because of its African-American community, that inference does not follow.

## DISCUSSION

Defendant seeks to suppress evidence and dismiss this case on the following grounds. Defendant first argues that Sgt. Danius did not have reasonable suspicion to initiate a *Terry* stop. Next, Defendant argues that Sgt. Danius lacked reasonable suspicion to believe he was armed and dangerous to justify a pat down search. Defendant also seeks to suppress evidence due to selective enforcement in violation of the Equal Protection clause. Finally, Defendant raises due process and *Trombetta/Youngblood* issues. The Court concludes that neither suppression nor dismissal are appropriate here.

The Court applies the following standard for Defendant's Fourth Amendment arguments. "On a motion to suppress, the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion. The defendant has the burden of showing

the Fourth Amendment was implicated, while the government has the burden of proving its warrantless actions were justified." *United States v. Goebel*, 959 F.3d 1259, 2020 WL 2642056, at *2–3 (10th Cir. 2020) (citations omitted).

I. **Sgt. Danius had reasonable suspicion to stop Defendant.**

Defendant argues that Sgt. Danius did not have reasonable suspicion to stop him. **Doc. 33 at 5.** The Court disagrees. The Court finds that Sgt. Danius had reasonable suspicion to approach Defendant and initiate a *Terry* stop.

"[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The officer must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant detention. The totality of the circumstances must be considered, and neither the officer nor the court need rule out the possibility of innocent conduct." *United States v. Goebel*, 959 F.3d 1259, 1267 (10th Cir. 2020).

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), *quoted in United States v. Reese*, No. 20-1044, 2021 WL 688676, at *3 (10th Cir. Feb. 23, 2021). Thus, reasonable suspicion may exist "even if it is more likely than not that the individual is not involved in any illegality." *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011) (quoting *United States v. Albert*, 579 F.3d 1188, 1197 (10th Cir. 2009)).

Sgt. Danius credibly testified that he stopped Defendant based on suspicion that he harassed another person in violation of NMSA § 30-3A-2. Further, Sgt. Danius witnessed

7

Defendant walking in the roadway in violation of the Albuquerque city code. *See* **Doc. 43-4,** Ex. 5, Ordinance 8-2-7-7(A) ("Where sidewalks are provided, it shall be unlawful for a pedestrian to walk along or upon an adjacent roadway."). "Harassment consists of knowingly pursuing a pattern of conduct that is intended to annoy, seriously alarm or terrorize another person and that serves no lawful purpose. The conduct must be such that it would cause a reasonable person to suffer substantial emotional distress." N.M. Stat. Ann. § 30-3A-2.

As noted in detail above, Sgt. Danius was driving his patrol car when a woman, standing on a sidewalk with Defendant, waved to Sgt. Danius as if to flag him down. She then pointed to Defendant. Sgt. Danius credibly testified that she appeared to be scared. Because he drove by them, Sgt. Danius did a U-turn and observed in his rearview mirror that Defendant was walking away.

Upon pulling up to the woman, Sgt. Danius asked her if she was okay. He testified that she said as follows. "That man right there, he was harassing me. He was asking me to date him. He was asking me for money. And he wouldn't leave me alone." Sgt. Danius testified that she appeared to be frightened, concerned, and "shaken up." He also testified that she said "He's harassing me. He's not leaving me alone. He's asking me for my number. He's asking to date him. If I have a boyfriend, and then he asked me for money." These facts known to Sgt. Danius prior to contacting Defendant amply support a reasonable suspicion of harassment.

Defendant had walked away and Sgt. Danius briefly lost sight of him. When Sgt. Danius caught up to Defendant to talk with him, Sgt. Danius credibly testified he observed Defendant walking in the street. This provided further support for reasonable suspicion of a violation of a city ordinance. Sgt. Danius' testimony is supported by the lapel video – in which Sgt. Danius told

Defendant that he was approached because (1) he was "bugging" the woman and (2) walking in the street.

The Court believes that the officer's observations and what the victim told him was sufficient for reasonable suspicion of harassment and walking in the street.

Defendant argues that there was no reasonable suspicion to stop him because a reasonable officer could not believe he harassed the woman, as harassment requires a pattern of conduct. The Court disagrees. A reasonable officer in the circumstances above could have found *reasonable suspicion* of harassment based on the above facts.

II. **Sgt. Danius had reasonable suspicion to pat down Defendant.**

Defendant also argues that Sgt. Danius lacked reasonable suspicion that he was armed and dangerous sufficient to pat him down. The Court disagrees.

"During the course of a valid investigative detention, an officer may conduct a limited protective search ('frisk') if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous." *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018) (citation and quotation marks omitted). A pat-down search is justified when "a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012) (citation and quotation marks omitted); *see also United States v. Torres*, 987 F.3d 893, 904 (10th Cir. 2021).

The facts above support the conclusion that Sgt. Danius had reasonable suspicion that Defendant was armed and dangerous, justifying the pat down. Defendant was accused of harassment and fled the scene. Moreover, when Sgt. Danius approached he reasonably and credibly believed that Defendant was abnormally nervous and had his hands raised. Sgt. Danius displayed no show of force. His firearm was holstered. Defendant stated he did not have

9

identification on him, and initially did not answer when Sgt. Danius asked if he was armed. Defendant said no when asked a second time. Defendant was wearing multiple layers of clothing including a jacket, and Sgt. Danius could not tell whether he had anything in his waistband. Defendant repeatedly stated he did not understand why he was being approached.

These facts, coupled together with the facts discussed above, created a reasonable suspicion for Sgt. Danius to believe that Defendant could be armed and dangerous to justify a pat down search.

### B. No evidence was discovered during the pat-down search.

Even if the pat-down search was not reasonable under the Fourth Amendment, no evidence was obtained from the pat-down search. Defendant has not explained why the gun – found later in a separate search – should be suppressed. "To successfully suppress evidence as the fruit of an unlawful detention, a defendant must first establish that the detention did violate his Fourth Amendment rights. … The defendant then bears the burden of demonstrating a factual nexus between the illegality and the challenged evidence." *United States v. Nava Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (internal quotation marks and citation omitted). "Evidence will not be suppressed as fruit of the poisonous tree unless an unlawful search is *at least* the but-for cause of its discovery." *United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006). A "but-for cause" is understood as the "factual nexus between the illegality and the challenged evidence." *Id.* "In *Chavira*, [the Tenth Circuit] held that there was no but-for causation because the unlawful VIN search "uncovered no contraband" and there was no connection between the cell phone officers discovered and the subsequent search." *United States v. Gomez-Arzate*, 981 F.3d 832, 840–41 (10th Cir. 2020).

Here, the pat down was not the but-for cause of the discovery of the firearm. Defendant has not explained the alleged factual nexus between the pat down and the firearm, which was not discovered in the pat down. The gun was apparently found following a search when he was arrested.

### C. Defendant does not appear to raise any other issues challenging detention, arrest, or discovery of the gun.

The Court notes that Defendant only appears to challenge (1) reasonable suspicion to initiate the stop and (2) Sgt. Danius' decision to pat him down, and does not appear to challenge his decision to place Defendant in handcuffs after Defendant resisted the pat down, or his arrest. *See* **Doc. 33 at 10-11.** To the extent Defendant does raise other issues, the Court does not believe that he has adequately placed them before the Court. Defendant summarily states in one line "the continual detention was unreasonable." **Doc. 33 at 11.** He similarly states that the second "pat-down" – which in fact appears to be a search following an arrest – was unreasonable. Defendant does not set forth any facts or argument suggesting the continued detention, the arrest, or the search incident to arrest was illegal. The Court does not believe that this is sufficient to place the issue before the Court. *See United States v. Barajas-Chavez*, 358 F.3d 1263, 1266 (10th Cir. 2004) (perfunctory raising of suppression issue without mentioning factual allegations "that are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact … are in issue.." does not put issue before the court).

### III. <u>Defendant did not show that Sgt. Danius selectively enforced the law against him.</u>

Defendant argues that Sgt. Danius *stopped* him because he was black and seeks dismissal of the charges against him. The motion focuses on the stop and does not mention probable cause

or his arrest. Therefore, the Court will analyze whether Sgt. Danius violated the Equal Protection clause in stopping Defendant. *See* **Doc. 33 at 17-18.** The Court concludes he did not.

The "Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *see Wayte v. United States,* 470 U.S. 598, 608 n. 9, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (ban on discriminatory law enforcement applies to the federal government under the Fifth Amendment). "Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall v. Columbia Lea Reg'l Hosp.,* 345 F.3d 1157, 1167 (10th Cir. 2003), *quoted in United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1263 (10th Cir. 2006).

A defendant alleging racial discrimination in a stop or arrest "must present evidence … that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006). To satisfy the discriminatory-effect element, one who claims selective enforcement "must ... make a credible showing that a similarly-situated individual of another race could have been, but was not, [stopped or] arrested ... for the offense for which the defendant was [stopped or] arrested...." *Id., quoting James,* 257 F.3d at 1179. "And the discriminatory-purpose element requires a showing that discriminatory intent was a motivating factor in the decision to enforce the criminal law against the defendant." *Id.* Discriminatory intent can be shown by either direct or circumstantial evidence. *See United States v. Deberry,* 430 F.3d 1294, 1299 (10th Cir.2005); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006). Though the

discriminatory purpose need not be the only purpose, it "must be a motivating factor in the decision." *Villanueva v. Carere,* 85 F.3d 481, 485 (10th Cir.1996).

This standard is a "demanding one" and Defendant "must dispel the presumption that a law enforcement official has not violated the Equal Protection Clause with clear evidence to the contrary." *United States v. Hernandez-Chaparro*, 357 F. App'x 165, 166 (10th Cir. 2009) (quotation marks omitted); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003) (same).

Here, Defendant's selective enforcement claim fails because he has not shown a discriminatory effect or purpose, or that "a similarly-situated individual of another race could have been, but was not, [stopped or] arrested ... for the offense for which the defendant was [stopped or] arrested...." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006). Individuals are similarly situated when there are no legitimate distinguishing factors that could justify a difference in the enforcement decisions. *United States v. DeChristopher*, 695 F.3d 1082, 1097 (10th Cir. 2012).

Defendant appears to point to the following to support his selective enforcement claim:

- Defendant produced the affidavit of Daniel Berg comparing the racial make up of the La Mesa community, where the stop occurred, and Bernalillo county. **Doc. B.** The La Mesa Community is a "minority community" with a population that was 15% white, 75% Hispanic, and 1.6% black. **Doc. B at 2.** The population of Bernalillo county was approximately 40% white, 49% Hispanic, and 2% African-American.[1] In other words, the population of African-Americans in La Mesa appears to be *smaller* than the population of African-Americans in Bernalillo county. No other statistical evidence on Albuquerque was presented. Defendant did not present statistical evidence regarding crime rates or stop or arrest rates.

- Sgt. Danius testified at a preliminary hearing that he was on a 45 day assignment on the street crimes unit which was a "proactive unit that goes out there and basically zero tolerance, looks for any violation, for any violations to reduce crime in the areas where the

---

[1] The racial breakdown of Bernalillo county is an estimate based on the graph provided by Defendant, which does not give specific numbers for Bernalillo county, but does for the La Mesa Community. *See* **Ex. B at 2.**

13

- crime is very high." **Doc. 19 at 11.** At the suppression hearing, he testified that this unit patrols neighborhoods and does not simply to respond to calls.

- Defense counsel argued, without any citation to the record or evidence, that a person in the Northeast quadrant of New Mexico would not have been stopped for walking in the street.

Taken together in the context of the stop, the Court concludes that the evidence presented by Defendant does not show a discriminatory effect or purpose.

Defendant argues that Sgt. Danius targeted him for walking in the street. That is not consistent with the evidence presented at the hearing. Sgt. Danius credibly testified that he went to stop Defendant after a woman flagged Sgt. Danius down and asserted that Defendant was harassing her and would not leave her alone. While pursuing Defendant, Sgt. Danius noticed that Defendant was *also* walking in the street. It is clear from the evidence that the reason Sgt. Danius pursued and stopped Defendant was primarily the allegation of harassment.

Defendant has not provided any evidence about how Sgt. Danius would have treated a similar harassment claim against another person. Here, there is nothing in the record to suggest that an officer under similar circumstances would not stop another person where (1) a woman flagged down an officer by waiving at him, (2) pointed to the suspect, (3) appeared to be afraid, (4) told the officer that the suspect was harassing her and would not leave her alone.

Defendant's statistical evidence falls well short of providing any usefulness for a selective enforcement claim. *See, e.g., Blackwell v. Strain*, 496 F. App'x 836, 840 (10th Cir. 2012) (describing statistical evidence use); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003) (noting that most selective law enforcement claims are "based on statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population"). For example, statistical evidence often includes "(1) reliable demographic information, (2) some manner of determining whether

the data represents similarly situated individuals, and (3) information about the actual rate of occurrence of the suspected crime across relevant racial groups." *United States v. Alabi*, 597 F. App'x 991, 997 (10th Cir. 2015).

The statistical evidence here only discusses the racial makeup of the La Mesa Community and Bernalillo county, and does not discuss crime rates, or stop or arrest rates. Therefore, the usefulness of the statistical evidence is extremely limited. Defendant appears to present the statistical evidence to show that Sgt. Danius was patrolling a minority community. The evidence presented by Defendant shows that the La Mesa community had a *lower* population of African-Americans than Bernalillo county. Defendant argues that Sgt. Danius targeted a "minority community " because the La Mesa community is 73.5% Hispanic. The Court notes that Defendant's statistics show that the Hispanic community is at least a plurality in Bernalillo county and potentially a majority. Defendant's statistical evidence does not appear relevant, especially in light of the fact that Defendant expressly states that Sgt. Danius stopped him because he was African-American.

Moreover, Sgt. Danius was patrolling the southeast area command, not just the La Mesa community. There is no statistical evidence provided on the southeast area command.

Of course, statistical evidence is not required. Defendant could point to other evidence such as an officer's behavior, statements and testimony, or record of racially selective enforcement. *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003). Defendant generally did not do so here.

Defendant takes issue with Sgt. Danius' statement at a preliminary hearing before Judge Khalsa that the street crimes unit was focusing on high crime areas. Sgt. Danius testified that the unit proactively patrolled areas and tried to address crimes in the community. Rather than simply

15

respond to calls, the goal of the unit was to patrol and address crime they observed. There is nothing in Sgt. Danius' testimony that would indicate a discriminatory purpose or effect, and defense counsel acknowledged at the hearing "well, every police officer would do that, correct? I mean, that's not special?"

Alternatively, Defendant's selective enforcement claim would fail even if Sgt. Danius stopped him because he was walking in the street. Defendant merely provided argument that someone walking in the northeast quadrant of Albuquerque, New Mexico would not be stopped for walking in the street. He did not provide evidence to support that argument. He did not address the racial make up of the population in northeast Albuquerque or compare the crime rates between the southeast quadrant and northeast quadrant.

## IV.     **Due Process**.

Defendant appears to assert two due process arguments. Defendant summarily argued that his due process rights were violated because there was no written procedure for proactive policing. No case law was cited. The record reflects there was no tactical plan regarding proactive policing. But the record establishes that proactive policing here means that an officer is not required to answer calls and simply observes and addresses potential criminal activity he or she sees. As Sgt. Danius noted, if he was investigating a crime, he would be required to have a reason to do so, and he would need a reason to believe a crime was committed before arresting someone. Sgt. Danius agreed that he could not simply arrest someone without a legitimate law enforcement reason. Therefore, Defendant has not shown why a special written procedure would be required here to do normal police work. Defendant's comparison to a roadblock is inapt. The Court declines to adopt a rule out of thin air that prohibits officers from patrolling the streets and responding when they observe potential criminal activity or have reasonable suspicion of a crime.

Defendant also gave a one-line argument in his motion that due process was violated because Sgt. Danius failed to ask the victim's name before pursing Defendant, who was leaving scene. In a reply brief, Defendant cited *Youngblood* and *Trombetta,* and argued that Officer Danius purposefully failed to collect any information about the woman, and that failure is the equivalent of failing to turn over exculpatory evidence. Initially, neither party has cited to case law that the failure to ask the victim's name while trying to catch a fleeing suspect under these circumstances would be a *Trombetta/Youngblood* issue. Assuming it is, Defendant has not satisfied the *Trombetta/Youngblood* standard.

Under *Trombetta*, "the government violates a defendant's due process rights when it destroys evidence that: (1) possess[es] an exculpatory value that was apparent before [it] was destroyed; and (2) is of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Gutierrez*, 415 F. App'x 870, 873 (10th Cir. 2011), *citing California v. Trombetta,* 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Under *Youngblood*, "the defendant must show: (i) that the evidence was "potentially useful for the defense;" and (ii) "that the government acted in bad faith in destroying the evidence." *United States v. Bohl,* 25 F.3d at 910 (quoting *Arizona v. Youngblood,* 488 U.S. at 58, 109 S.Ct. 333).

There is nothing in the record to suggest that the name of the woman would be exculpatory, especially when Defendant was not charged in this case with harassment. Defendant has also not shown that the evidence was potentially useful to the defense or that the government acted in bad faith in "destroying" the evidence. Sgt. Danius' failure to ask the victim's name was not in bad faith. The Court finds any failure by Sgt. Danius to ask the victim's name was inadvertent or a

mistake in his attempt to quickly catch up to Defendant, who had walked away. Sgt. Danius credibly testified that he left to catch up to Defendant before he fled the area.

**IT IS THEREFORE ORDERED** that the Defendant's Motion to Suppress Evidence **(Doc. 33)** is hereby **DENIED.**

_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE